```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TENNESSEE
                       WESTERN DIVISION
```
_____

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )   No. 10-20176-Ma/P |
| **TRAVONTE JOHNSON,** | ) |
| | ) |
|     **Defendant.** | ) |

_____

                    REPORT AND RECOMMENDATION
_____

Before the court by order of reference is defendant Travonte Johnson's Motion to Suppress Evidence. (D.E. 28.) Pursuant to the order of reference, the court conducted a suppression hearing on the motion. At the hearing, the court heard testimony from Memphis Police Department ("MPD") Detective Willie Bryant, Detective Jonathan Overly, and Sergeant Jeffrey Dunn. The court also heard testimony from defense witness Tamika Bland. The court admitted into evidence the following exhibits: (1) a citizen complaint e-mail sent to MPD (Ex. 1); (2) three photographs of Bland's residence (Ex. 2.); (3) a Consent to Search form (Ex. 3); (4) a Rights Waiver form (Ex. 4); (5) an Organized Crime Unit ("OCU") supplement report (Ex. 5); (6) an arrest ticket (Ex. 6); (7) an affidavit of complaint (Ex. 7); and (8) a letter written and sent by Johnson to Bland (Ex. 8). At the conclusion of the hearing, the court granted Johnson's oral motion to allow the parties to review

the hearing transcript and file post-hearing briefs.

Based on the briefs filed in support of and in opposition to the motion, the evidence presented at the hearing, and the post-hearing briefs, the court submits the following proposed findings of fact and conclusions of law, and recommends that the Motion to Suppress be denied.

## I.   PROPOSED FINDINGS OF FACT

The court has carefully considered the testimony of all of the witnesses, including their demeanor as they testified at the hearing, and finds the officers' testimony to be credible. Further, to the extent Bland's testimony contradicts the officers' testimony, the court finds her testimony to be not credible. In particular, the court finds as being not credible Bland's testimony on direct examination about the circumstances under which she gave verbal consent to search her house, including her testimony that the officers initially entered the house without her permission and that they told her that she and Johnson would not be charged with the firearm if she cooperated with the investigation. The court also finds as being not credible her testimony that she did not sign the Consent to Search form.[1]

---

[1] The detectives testified that Bland signed both forms. The arrest ticket and affidavit of complaint state that Bland gave the officers written consent to search the house. Moreover, the court has compared the signature found on the Consent to Search form to the signature found on the Rights Waiver form (which Bland admits she signed). The signatures on both forms are substantially similar.

On March 25, 2009, the MPD received an anonymous e-mail addressed to "Inspector Godwin" and signed by "A Concerned Neighbor in Raleigh." The e-mail stated in pertinent part as follows:

> I am a concerned, and hardworking neighbor in the Raleigh Community. There is a home at 3780 Walsingham Drive in Memphis 38128, and I believe the man is selling drugs out of this home. It is extra sad because there are minor children in and around the home. Many nights, even through the week there are cars of people who come to this home and go inside. They stay for a few minutes and leave. The people are all different, different vehicles, black, white, young, old etc. Some nights, like last night the people cause [sic] a disturbance on the street.

(Ex. 1.)[2]

The citizen complaint was subsequently assigned to OCU Team 8. At approximately 7:15 p.m. on April 1, 2009, five to six MPD officers arrived at the Walsingham Drive residence for the purpose of conducting a "knock and talk" investigation. The officers parked their unmarked police vehicles on the street in front of the residence. They noticed that the garage door was open. From the street, the officers observed a black male, later identified as defendant Travonte Johnson, standing in the doorway that connected the garage to the residence. When Johnson saw the officers get out of their vehicles, he immediately closed the door. The garage door, however, remained open.

Three of the officers then walked into the garage and knocked on the door that they had just seen Johnson close, while the other

---

[2]Law enforcement never spoke with the anonymous tipster.

officers went around the house to monitor the perimeter. The officers wore black vests marked "Police." Tamika Bland, the homeowner, answered the door. One of the officers, Detective Willie Bryant, told Bland that they were investigating a drug complaint and asked if they could come inside and search her house. Bland responded by stating, "Yes, I don't have anything to hide." At no point did the officers draw their weapons or make any verbal threats. Detective Bryant described his encounter with Bland as follows:

> Q. What did you ask to do?
>
> A. We asked her permission could we walk through the house to make sure that everything was okay and there was no one else was inside the resident. And we asked her for consent to search her resident.
>
> Q. And did she verbally indicate that she understood what you were asking of her?
>
> A. Yes, sir.
>
> Q. And how did she verbally indicate that?
>
> A. She said, yes, I don't have anything to hide.
>
> Q. Okay. And did she allow you inside the house?
>
> A. Yes, sir.
>
> Q. Now, at this point in the encounter, were your guns drawn?
>
> A. No, sir.
>
> Q. Did you threaten her with a search warrant or anything like that?
>
> A. No, sir.

>  Q. Were you yelling at her or talking to her in a raised voice?
>
>  A. No, sir.
>
>  Q. Did you have lights and sirens going in your cars parked outside?
>
>  A. No, sir.
>
>  Q. Were you communicating to her with a bullhorn or anything of that nature?
>
>  A. No, sir.
>
>  Q. Fair to say you just simply asked if you could come inside and search?
>
>  A. Yes, sir.

(Tr. at 22:13-23:20.)  Similarly, on cross-examination Bland testified as follows:

>  Q. Okay.  So the police knock on the door?
>
>  A. uh-huh (affirmative response).
>
>  Q. And do you recall there being an African American officer?
>
>  A. Yes.
>
>  Q. Detective Bryant?
>
>  A. Uh-huh (affirmative response).
>
>  Q. Is he the one that did most of the talking?
>
>  A. Yes.
>
>  Q. And did he tell you who he was?
>
>  A. Yes.
>
>  Q. Did he tell you he was with Memphis Police Department?

-5-

A. Yes, he did.

Q. Did he tell you that they were called to the house for a drug complaint?

A. Yes, he did.

Q. And did he ask you can we come inside and take a look around?

A. Yes, he did.

Q. And did you let him come inside and take a look around?

A. Yes, I did.

Q. Did you open the door and let them in?

A. I opened the door and let them in.  And he told me to have a seat at the table.

Q. Were you upset?

A. I was upset and shooken up at the time.

Q. Did he try to calm you down?

A. Yes, he did.

Q. Was he nice to you?

A. Yes, he was.

Q. Do you feel like he bullied you into letting him inside the house?

A. No.

Q. And his gun was not drawn?

A. No.

Q. Were any of the officers' guns drawn?

A. No.

Q. Did any of them tell you you have to let us in?

>     A.   No.
>
>     Q.   They asked can we come inside?
>
>     A.   Yes.
>
>     Q.   And you said okay?
>
>     A.   Yeah.

(Tr. at 109:16-111:12.)

Immediately upon entering the residence, the officers observed a handgun on the kitchen table. They seized the handgun and discovered that it was loaded.[3] The officers asked Bland if anyone else was inside the residence. She stated that her boyfriend was in the back of the house. The officers then went to the back of the residence and found Johnson in a bedroom pretending to be asleep. Approximately one to three minutes elapsed between the time the officers initially saw Johnson in the doorway of the garage and the time the officers found Johnson in the back bedroom. The officers brought Johnson to the front of the house and conducted a warrants check. The officers learned that Johnson was wanted on an outstanding warrant, and as a result, he was placed under arrest.

At some point after the officers found Johnson, they presented Bland with a Consent to Search form, which she read, indicated she understood, and signed in the presence of the officers. Upon a

---

[3]The door through which the officers entered opened directly into the kitchen.

further search of the residence, the officers found approximately fourteen grams of marijuana and a digital scale in the master bedroom. Afterwards, the officers presented Bland with a Rights Waiver form, which she reviewed and signed.[4] The form indicated that Bland understood her <u>Miranda</u> rights and agreed to answer questions. Bland stated that the gun found in the residence belonged to Johnson.[5]

Johnson was indicted for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Subsequently, Johnson was also indicted for a violation of 18 U.S.C. § 1512(b)(1), based on a letter that Johnson allegedly wrote to Bland to persuade her to provide false testimony at the suppression hearing.

## II.  PROPOSED CONCLUSIONS OF LAW

---

[4] The arrest ticket suggests that Bland signed the Consent to Search form before the officers found Johnson in the bedroom and the firearm in the kitchen. (Ex. 6.) However, according to the officers' testimony at the hearing, the sequence of events was as follows: (1) Bland first gave verbal consent to the officers to enter and search her residence; (2) upon entering the residence, the officers saw the handgun on the kitchen table and seized the weapon; (3) the officers conducted a protective sweep of the residence and found Johnson in the bedroom; (4) the officers obtained Bland's written consent to search; and lastly, (5) the officers found marijuana and a digital scale in the master bedroom. (Tr. at 53-54, 60-61.)

[5] Johnson also gave a written post-arrest statement, in which he stated that he was a convicted felon and "guess[ed]" that someone brought the firearm to Bland's residence. (Def.'s Mot. to Suppress Ex. 3; Tr. at 85-86.) The court notes that the Motion to Suppress seeks to suppress Johnson's post-arrest statement only on the grounds that the statement was obtained as a result of the unlawful entry into and search of Bland's house.

In his Motion to Suppress and post-hearing brief, Johnson raises two arguments in support of his contention that the physical evidence found in Bland's house and his post-arrest statement should be suppressed.  First, Johnson argues that the officers impermissibly conducted a "knock and talk" without first verifying the information contained in the citizen complaint e-mail.  Second, Johnson argues that Bland's verbal consent was not voluntary and, furthermore, that she never signed the written Consent Form.[6]

Johnson's first argument is without merit, as it is well-established that "[a]n officer may initiate a knock and talk without any objective level of suspicion."  Pritchard v. Hamilton Twp. Bd. of Trs., No. 09-4594, 2011 WL 2039066, at *6 (6th Cir. May 25, 2011) (citing United States v. Thomas, 430 F.3d 274, 277 (6th Cir. 2005)).  Any resulting discussion with a suspect does not implicate the Fourth Amendment.  Thomas, 430 F.3d at 277 (citing cases).  Here, the officers went to Bland's house based on an anonymous citizen complaint email that described possible drug activity at that residence.  As they pulled up to the residence, they observed Johnson look at them and then quickly close the door.  Thus, even though the officers were not required to have "any objective level of suspicion" in order to conduct the knock and

---

[6]It appears that Johnson has "standing" to challenge the search, based on Bland's testimony that she owned the house, Johnson was her boyfriend at the time, and he stayed there occasionally as an overnight guest.  The government does not challenge Johnson's standing to challenge the search.

talk, they in fact had information (the citizen complaint) which gave them a reason to talk to the residents of the house. The officers were not required to conduct any further investigation regarding the accuracy of the information contained in the e-mail prior to conducting the knock and talk.

As for Johnson's second argument, his reliance in his post-hearing brief on Thomas, United States v. Saari, 272 F.3d 804 (6th Cir. 2001), and United States v. Morgan, 743 F.2d 1158 (6th Cir. 1984), is misplaced. In Thomas, officers conducting a methamphetamine investigation went to the defendant's house to conduct a knock and talk. The officers arrived at the residence in four patrol cars. Two officers knocked on the back door while two other officers went to the front door. When the defendant came to the back door, the officers told him that they wanted to talk to him and asked him to come outside. After the defendant exited the house, he refused to talk and requested an attorney, at which point the officers arrested him.

The Court of Appeals explained that a knock and talk investigation does not violate the warrant requirement to the Fourth Amendment so long as the encounter does not evolve into a constructive entry. Thomas, 430 F.3d at 277. The court defined a constructive entry as follows:

> . . . we have held that a consensual encounter at the doorstep may evolve into a "constructive entry" when the police, while not entering the house, deploy overbearing tactics that essentially force the individual out of the

-10-

> home. In <u>United States v. Morgan</u>, 743 F.2d 1158 (6th Cir. 1984), we held that a "constructive entry" occurred when a suspect emerged from a house "in response to coercive police conduct." <u>Id.</u> at 1166. And in <u>United States v. Saari</u>, 272 F.3d 804 (6th Cir. 2001), we described coercive police conduct as "such a show of authority that [the] Defendant reasonably believed he had no choice but to comply." <u>Id.</u> at 809.

<u>Id.</u> The court concluded that the officers' conduct did not rise to the level of a constructive entry because the officers did not draw their weapons, raise their voices, or use coercive commands to draw the defendant out of the house. <u>Id.</u> The court reversed the lower court's order granting the defendant's motion to suppress.

In <u>Morgan</u>, nine officers investigating a shooting went to the defendant's residence and "flooded the house with spotlights and summoned [the defendant] from [the residence] with the blaring call of a bullhorn." <u>Morgan</u>, 743 F.2d at 1161. In response to the officers' actions, the defendant appeared at the door with a pistol, stepped outside, and was arrested and searched. The court concluded that the officers' arrest of the defendant outside of his home amounted to a constructive entry, as he "appeared at the door *only because of* the coercive police behavior taking place outside the home." <u>Id.</u> (citations omitted).

In <u>Saari</u>, four officers investigating a "shots fired" call went to the defendant's apartment. As the officers knocked on the front door, one officer had a shotgun drawn and in a "low ready" position while other officers had their weapons drawn. Subsequently, the defendant answered the door and was ordered to

-11-

exit the apartment. The defendant informed the officers that he had a gun on him, which was seized by officers. Saari, 272 F.3d at 806-07. The court, in affirming the trial court's order granting the defendant's motion to suppress, concluded that the officers exhibited such a show of authority that the defendant "reasonably believed that he had no choice but to comply." Id. at 809. Therefore, the officers' actions constituted a constructive entry and in-home arrest. Id. at 809.

Thomas, Morgan, and Saari are inapplicable to the instant case, as those were constructive entry cases involving searches and arrests conducted outside of the defendants' homes, and it is undisputed that neither Bland nor Johnson were compelled to come out of the house. To the extent Johnson relies on these cases for the proposition that officers' show of force can be so coercive that it could compel an occupant to involuntarily give consent to search, the facts of the present case demonstrate that, like in Thomas, the officers' show of authority was not coercive. Although five or six officers with "Police" vests initially approached Bland's residence, only three officers appeared at the door. The officers did not raise their voices, use a bullhorn, activate their lights or sirens, or draw their weapons. Detective Bryant identified himself to Bland, explained that the officers were investigating a drug complaint involving the residence, and asked for and obtained permission to come inside and search the house.

-12-

Although Bland testified that she was upset, she also testified that Detective Bryant tried to calm her down and that he was "nice" to her.  Bland did not revoke her consent, and although it was not necessary for the officers to obtain her written consent after initially obtaining her verbal consent to search, the fact that Bland signed the Consent to Search form further demonstrates the voluntariness of her consent.  In sum, the court finds that Bland's verbal consent and written consent were freely and voluntarily given, and that her consent was not the result of coercion, duress, or submission to a claim of authority.  See United States v. Dye, No. 1:10CR221, 2011 WL 1595255, at *6 (N.D. Ohio Apr. 27, 2011).

### III.  RECOMMENDATION

For the reasons above, it is recommended that the Motion to Suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

July 21, 2011
Date

### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**